# In the United States Court of Federal Claims

No. 20-758C
Filed: November 23, 2020
Reissued: November 30, 2020[1]

| | |
|---|---|
| **MELWOOD HORTICULTURAL TRAINING CENTER, INC.,**<br><br>*Plaintiff,*<br><br>v.<br><br>**THE UNITED STATES,**<br><br>*Defendant.* | **Keywords:** Motion to Dismiss; RCFC 12(b)(1); Ripeness; Pre-Award Bid Protest; AbilityOne; Section 898, National Defense Authorization Act of Fiscal Year 2017, Pub. L. No. 114-328, 130 Stat 2000; Javits-Wagner O'Day Act, 41 U.S.C. §§ 8501–06; 41 C.F.R. 51 |

*Meghan A. Douris* and *Alix K. Town*, Oles Morrison Rinker & Baker, LLP, Seattle, WA, for the Plaintiff.

*Steven C. Hough*, Trial Attorney, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, Commercial Litigation Branch, *Jeffrey Bossert Clark*, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., *Robert B. Neill*, *Mark T. Robinson*, United States Army, and *Timi N. Kenealy*, United States AbilityOne Commission, Of Counsel, for the Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

This is an unconventional pre-award, pre-solicitation bid protest involving the second iteration of a Pilot Program purportedly authorized by a panel established under Section 898 of the 2017 National Defense Authorization Act. Plaintiff, Melwood Horticultural Training Center ("Melwood"), challenges not only the United States' *intent* to recompete a contract for base operations support services provided to the U.S. Army, but also the selection of Fort Meade, Maryland for the Pilot Program. The United States argues that this case is not yet ripe.

Melwood brought these challenges on June 23, 2020, before the United States solicited bids for a new contract award. (Compl., ECF No. 1). That same day, Melwood filed a Motion for

---

[1] This Opinion was originally issued under seal. On November 30, 2020, the parties notified the Court that no redactions were necessary. (ECF No. 54). The Court therefore reissues this Opinion without redactions but with two immaterial typo corrections.

Temporary Restraining Order, seeking an order enjoining the United States, acting through the AbilityOne Commission ("AbilityOne" or "the Commission"), from issuing a request for proposals. The Court denied that Motion on June 26, 2020. (Order Denying TRO, ECF No. 11).

On July 15, 2020, the United States issued an opportunity notice for a Base Operations and Maintenance services contract at Fort Meade. (Administrative Record ("AR") at 2, 1543, ECF No. 22). The United States filed the administrative record for its decision on July 24, 2020. Soon thereafter, the Court denied Melwood's Motion to Supplement the Administrative Record. (Order Denying Mot. to Suppl., ECF No. 33; Pl.'s Mot. to Suppl. AR, ECF No. 26).[2]

On August 26, 2020, Melwood moved for judgment on the administrative record. (Pl.'s MJAR, ECF No. 34). When the United States filed its Response and Cross-Motion for Judgment on the Administrative Record (Def.'s Mot., ECF No. 42), the United States moved to dismiss Melwood's claims under RCFC 12(b)(1) and 12(b)(6). The parties each filed timely reply briefs. This matter now stands submitted.

For the reasons set forth below, the Court **GRANTS** the United States' Motion to Dismiss, **DENIES AS MOOT** Melwood's Motion for Judgment on the Administrative Record, and **DENIES AS MOOT** the United States' Cross-Motion for Judgment on the Administrative Record.

## I.   Background

### A.   The AbilityOne Program

In 1971, Congress passed the Javits-Wagner O'Day Act ("JWOD"), which updated the Wagner-O'Day Act of 1938. Pub. L. No. 92–28, § 1, 85 Stat. 77 (1971) (codified as amended at 41 U.S.C. §§ 46–48c (2006)).[3] JWOD established the "Committee for Purchase From People Who Are Blind or Severely Disabled." 41 U.S.C. § 8502. That Committee, colloquially known as the AbilityOne Commission, exists to carry out the Federal Government's policy of "increas[ing] employment and training opportunities for persons who are blind or have other severe disabilities through the purchase of commodities and services from qualified nonprofit agencies employing persons who are blind or have other severe disabilities." 41 C.F.R. § 51-1.1.

In order to implement these policy goals, procurements under the JWOD function differently than traditional government procurements. For example, AbilityOne maintains a Procurement List, which it publishes to the Federal Register, containing products and services produced or provided by qualified nonprofit agencies ("NPA") and available for purchase by the

---

[2] Although Melwood moved to supplement the record, because it sought to fill "gaps in the record" rather than add to it, the Court construed Melwood's request as a motion to complete the administrative record. Because Melwood "produced no 'clear evidence of material that was generated or considered by the agency but excluded from the record,'" the Court held that it was "entitled to rely on the presumption that the record the United States has submitted is complete." (Order Denying Mot. to Suppl. at 2).

[3] Congress amended JWOD in 2011 and recodified it at 41 U.S.C. §§ 8501–06.

2

Federal Government. 41 U.S.C. §§ 8503–8504. Qualified NPAs must employ "blind or other severely disabled individuals for at least 75 percent of the hours of direct labor required for the production or provision of the products or services." § 8501. The Federal Government purchases products and services from the Procurement List at Fair Market Prices that are determined by the Commission. § 8503(b). The Commission may, "from time to time . . . revise its price determinations . . . in accordance with changing market conditions." § 8503(b).

AbilityOne also must designate central nonprofit agencies ("CNA") to help "facilitate the distribution" of government contracts among the qualified nonprofit agencies. § 8503(c). SourceAmerica is the CNA applicable to this action. (Compl. at 3). The process for "determin[ing] the fair market price of products and services contained on the procurement list" involves the "contracting activity," the qualified nonprofit agency, and the CNA (in this case, SourceAmerica). 41 C.F.R. § 51-2.7(a). The "contracting activity" is "any element of an entity of the Government that has responsibility for identifying and/or procuring Government requirements for commodities or services." 41 C.F.R. § 51-1.3. The "initial price is based on Committee procedures, which permit negotiations between the contracting activity and the nonprofit agency which will produce or provide the commodity or service to the Government, assisted by the appropriate central nonprofit agency." 41 C.F.R. § 51-2.7(a). "Recommendations for initial fair market prices, or changes thereto, shall be submitted jointly by the contracting activities and nonprofit agencies concerned to the appropriate central nonprofit agency." 41 C.F.R. § 51-2.7(c). SourceAmerica will then submit the recommended price to AbilityOne. 41 C.F.R. § 51-2.7. Because the policy of the AbilityOne program is to "increase employment and training opportunities for persons who are blind or have other severe disabilities," procurements under the program are designated as "other than competitive." *See* 41 U.S.C § 3304(a)(5). The effect of being designated "other than competitive" is that for procurements in the AbilityOne program, "[f]ull and open competition need not be provided[.]" FAR 6.302-5(a)(2), (b)(2).

### B. The 2017 National Defense Authorization Act (NDAA) and the Pilot Programs

On December 23, 2016, Congress passed the National Defense Authorization Act For Fiscal Year 2017 ("NDAA"). NDAA For Fiscal Year 2017, Pub. L. No. 114-328, 130 Stat 2000 (2016). Section 898 of the NDAA stated that "[t]he Secretary of Defense shall establish a panel to be known as the 'Panel on Department of Defense and AbilityOne Contracting Oversight, Accountability, and Integrity'" (the "898 Panel"). The 898 Panel was tasked to:

> (4) recommend changes to law, regulations, and policy that the Panel determines necessary to eliminate vulnerability to waste, fraud, and abuse with respect to the performance of contracts of the Department of Defense;
>
> . . .
>
> (6) recommend ways the Department of Defense and the AbilityOne Commission may explore opportunities for competition among qualified nonprofit agencies or central nonprofit agencies and ensure an equitable selection and allocation of work to qualified nonprofit agencies;

NDAA § 898(c)(4), (6). The 898 Panel was also directed to "consult[] with central nonprofit agencies and qualified nonprofit agencies" and "suggest milestone dates for implementation of the recommendations made under subsection (c)[.]" NDAA § 898(f)(1). These recommendations would also be compiled in an annual report to Congress required by § 898(i). *See also Pride Indus., Inc. v. Comm. for Purchase From People Who Are Blind or Severely Disabled*, 420 F. Supp. 3d 1035, 1039 (E.D. Cal. 2019) (summarizing the required contents of the annual report).

The authority to implement these recommendations is somewhat ambiguous. Under subsection (e), the 898 Panel has the "authority [to] request documentation or other information needed from the AbilityOne Commission, central nonprofit agencies, and qualified nonprofit agencies." NDAA § 898(e). If AbilityOne fails to substantially implement the recommendations, the Secretary of Defense, upon receiving notification, "may suspend compliance with the requirement to procure a product or service [from the Procurement List] until the date on which the Secretary notifies Congress, in writing, that the AbilityOne Commission is substantially implementing the [898 Panel's] recommendations[.]" NDAA § 898(g)(1)(A).

On July 18, 2018, the 898 Panel submitted its First Annual Report to Congress. (AR15–84). In its First Annual Report, the 898 Panel stated that "CNA and NPA perception that a designated NPA remains the provider of a product or service in perpetuity can erode performance, escalate prices, and impact customer satisfaction, and the AbilityOne Program Reputation and employment." (AR44). Therefore, the 898 Panel recommended "changes to how work is assigned or re-assigned, and also changes to Title 41 CFR 51." (AR44).[4] The proposed changes included "adding policy which would establish mandatory source selection procedures" that "would require CNAs to use a specific list of measurable qualifications when choosing an NPA for the project assignment, such as *price*, technical capability for the work, past performance, and the percentage of disabled hours." (AR44) (emphasis added). For procurements, the 898 Panel proposed "[r]equir[ing] [a] best value trade-off analysis process that considers price . . .." (AR45).

In spring of 2019, the Army advised Pride Industries, Inc.—an AbilityOne NPA contractor—that it would extend Pride's Facilities Support Operations contract at Fort Bliss until January 2020, after which "the contract would be performed by the party awarded the contract by AbilityOne through a new, pilot procurement process." *Pride Indus.*, 420 F. Supp. 3d at 1040. On June 10 and 11, 2019, AbilityOne announced two new policies which would comprise its new Pilot Program for the AbilityOne procurement process. (AR85–87, 88–90). The first, Interim Policy 51.301.1, announced "changes relevant to pilot test(s), in which a competitive nonprofit agency (NPA) recommendation process will be conducted, considering technical capability, past performance, and *price*." (AR85) (emphasis added). The second policy, Interim Policy 51.320.1, directed CNAs "not [to] provide technical and/or pricing assistance to any NPA participating in the pilot test." (AR89). Instead, NPAs were instructed to "provide their pricing

---

[4] The regulations pertinent to the AbilityOne Program are contained in Title 41 C.F.R. Chapter 51.

4

information in accordance with the instructions included in the Opportunity Notice as well as existing and interim Commission policy and procedures." (AR89).

On July 31, 2019, the AbilityOne Commission initiated the first iteration of this Pilot Program procurement at Fort Bliss. *See Pride Indus.*, 420 F. Supp. 3d at 1041; (*see also* AR325, 1470). In that procurement, the incumbent, Pride Industries, was reselected to perform the Facilities Support Contract and the Army recognized a 20 percent cost savings over the life of the contract. (AR1470).

### C. *Melwood's Base Operations Support Services Contract at Fort Meade*

Melwood is a not-for-profit organization which employs persons who are blind or otherwise severely disabled. (*See* Pl.'s MJAR at 4; Compl. at 1). In May 2011, Melwood was added to the Procurement List as a qualified NPA contractor. (AR2). Melwood was enlisted to provide Base Operation Support Services for multiple buildings at Fort Meade, an Army installation in Maryland that is home to approximately 55,000 military and civilian personnel. (*See* AR137). These support services include facilities maintenance, refuse removal, groundskeeping, snow and ice removal, and other similar services. (AR91–108).

In recognition of saved costs and other benefits from the first Pilot Program procurement at Fort Bliss, the Army requested that AbilityOne conduct a second iteration of its Pilot Program for the Base Operations Support Services Contract ("BOSS Contract") at Fort Meade. (AR1471). Melwood's Fort Meade contract was set to expire at the end of June 2020 but given several options to extend the contract. (AR342, 354). The Army had undertaken an Independent Estimate for pricing of the Fort Meade contract on December 11, 2019. (AR334). This estimate showed a base year total cost of $26,062,290.04 and a five-year total cost of $136,521,931.90. (AR334, 339). On December 19, 2019, AbilityOne responded to the Army's interest via email, stating that it would be "happy to work with" the Army on a second Pilot Program procurement. (AR341).

On May 12, 2020, the Army published a press release announcing Fort Meade had been selected for the second iteration of the Pilot Program. (AR347). Several days later, AbilityOne notified Melwood of this press release by email. (AR347). On May 28, 2020, the Executive Director of AbilityOne signed a Memorandum of Agreement formalizing the decision to initiate the Pilot Program at Fort Meade. (AR358–61).

On June 23, 2020, Melwood filed a pre-solicitation, pre-award bid protest challenge, seeking to "prevent the issuance of the Opportunity Notice and/or RFP" and to "challenge . . . the Government's *intent* to compete the Fort Meade Base Operations contract." (Compl. at 1) (emphasis added). Melwood also moved for a temporary restraining order, alleging it would suffer irreparable reputational harm should the United States be permitted to proceed with the solicitation. (*See* Order on TRO, ECF No. 11). On June 26, 2020, the Court denied Melwood's request. (*Id.*). On July 14, 2020, AbilityOne formally authorized the Pilot Program procurement process for the BOSS Contract at Fort Meade and directed SourceAmerica to post the opportunity notice. (AR1468–74). SourceAmerica then posted the opportunity notice on July 15, 2020. (*See* AR1543).

## II. Analysis

Melwood's Complaint challenges the procurement at Fort Meade on three grounds. First, Melwood alleges that "the Commission has violated FAR 8.705-4 by improperly canceling the Fort Meade [BOSS] contract with Melwood." (Compl. at 9). Second, Melwood argues that AbilityOne's "source selection plan for the Fort Meade [BOSS] re-procurement violates 41 U.S.C. § 8503, FAR 8.707, FAR 6.302-5(b)(2), and 41 C.F.R. § 51-2.7 as [it] relinquishes [AbilityOne's] responsibility to establish a fair market price to a competition between the nonprofit agencies, which is specifically prohibited." (Compl. at 10). Third, Melwood alleges a violation of the Administrative Procedures Act, 5 U.S.C. § 701–706, and seeks a declaratory judgment that "the Section 898 Panel's pilot program and the selection of the Fort Meade [BOSS] contract's participation in that program is arbitrary, capricious, an abuse of discretion, and otherwise in violation of law." (Compl. at 10–11).

Each party has moved for judgment on the administrative record with respect to these challenges. The United States has also moved to dismiss Melwood's Complaint on various jurisdictional grounds. (*See generally*, Def.'s Mot.) (seeking dismissal for want of subject matter jurisdiction, for being unripe, and for failure to state a claim). Because jurisdiction is a threshold issue, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998), the Court will address these arguments first before turning to the remaining challenges.

### A. Legal Standards

#### i. Bid Protests

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In bid protest cases, this Court reviews agency actions under the Administrative Procedure Act's "arbitrary and capricious" standard. *See* 28 U.S.C. § 1491(b)(4). Under this standard, an "award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

In this regard, the United States Court of Appeals for the Federal Circuit has explained that: "when a challenge is brought on the first ground, the test is 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a "heavy burden" of showing that the award decision had no rational basis.'" *Id*. at 1332–33. "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333. In addition, when reviewing an agency's procurement decision, the Court should recognize that the agency's decision is entitled to a "presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "The [C]ourt should not substitute its judgment for that of a procuring agency." *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997). And so, "[t]he protestor must

show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law." *Info. Tech. & Applics. Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) (citation omitted).

The Court's standard of review "is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). As long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). But, if "the agency 'entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency,'" then the resulting action lacks a rational basis and, therefore, is defined as "arbitrary and capricious." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

      ii. <u>Motion to Dismiss</u>

To survive a Motion to Dismiss under RCFC 12(b)(1), the Complaint must "allege sufficient facts to establish the court's jurisdiction," the basis of which must be "affirmatively and distinctly set forth." *DaimlerChrysler Corp. v. United States*, 442 F.3d 1313, 1318–19 (Fed. Cir. 2006). The burden of establishing subject matter jurisdiction rests with the plaintiff, who must do so by a preponderance of the evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). This Court's jurisdiction to entertain claims and grant relief depends on the extent to which the United States has waived sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976). When faced with a motion to dismiss for lack of subject matter jurisdiction pursuant to the RCFC Rule 12(b)(1), the Court must assume that all undisputed facts alleged in the complaint are true and draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). The movant, however, may challenge the truth of any facts upon which jurisdiction depends. *See Raymark Indus. v. United States*, 15 Cl. Ct. 334, 338 (1988). If it does, the plaintiff must come forward with prima facie showing of jurisdiction. *Id.* The plaintiff cannot rely only on its allegations. *See Hornback v. United States*, 52 Fed. Cl. 374, 377 (2002).

Moreover, the Court may look to evidence outside of the pleadings in order to ascertain the propriety of its exercise of jurisdiction over a case. *Rocovich v. United States*, 933 F.2d 991, 994 (Fed. Cir. 1991), *aff'd in relevant part*, *Martinez v. United States*, 281 F.3d 1376 (Fed. Cir. 2002). In that vein, a Court may refrain from exercising its jurisdiction over a claim that is not yet ripe. *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725 (1997); *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 n.18 (1993) ("We have noted that ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."). Thus, dismissal of an unripe claim is most appropriate under RCFC 12(b)(1). If the Court determines at any time that subject matter jurisdiction is lacking, it must dismiss the complaint. *See* RCFC 12(h)(3).

### B. Count I Must be Dismissed Under RCFC 12(b)(1) for Lack of Subject Matter Jurisdiction

Count I of Melwood's Complaint alleges that "the Commission has violated FAR 8.705-4 by improperly canceling the Fort Meade Base Operations Support Services contract with Melwood." (Compl. at 9). The United States' Cross-Motion and Motion to Dismiss argues that Count I "involves a dispute arising out of the contract between the parties, and therefore must be brought under the Contract Disputes Act (CDA)—not under the Court's bid protest jurisdiction." (Def.'s Mot. at 14) (internal citations and alterations omitted). Consequently, the United States argues, Count I must be dismissed for either lack of subject matter jurisdiction under RCFC 12(b)(1) or for failure to state a claim under RCFC 12(b)(6). (Def.'s Mot. at 14). The Court agrees that, under its bid protest jurisdiction, it lacks subject matter jurisdiction to adjudicate what is essentially a wrongful termination of contract claim, and thus dismissal under RCFC 12(b)(1) is appropriate.

Melwood maintains that its claim "is a proper pre-award protest – not a [CDA] claim." (Pl.'s Opp. at 9). Melwood argues that "once a party objects to a procurement, [28 U.S.C.] section 1491(b)(1) provides a broad grant of jurisdiction[.]" (*Id.* (citing 41 U.S.C. § 111, which defines "procurement" as "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.")). Melwood has indeed brought its claims under 28 U.S.C. § 1491(b) (bid protest jurisdiction) and 5 U.S.C. § 702 (judicial review under the APA). (*See* Compl. at 2). However, Count I concerns the improper cancellation of a contract, which is inherently a contract administration challenge that must be brought under the Contract Disputes Act. Melwood cannot attempt to reframe this contract administration challenge as a bid protest through its briefs.

"When a plaintiff's claim involves a breach of a contract with the Government before the expiration of the contract, the court cannot hear the claim *as a bid protest* because '28 U.S.C. § 1491(b) provides no jurisdiction for claims of wrongful termination or breach.'" *Gonzalez-McCaulley Inv. Grp., Inc. v. United States*, 93 Fed. Cl. 710, 716 (2010) (quoting *The Ravens Group v. United States*, 78 Fed. Cl. 390, 398 (2007)). "[C]laims related to the ongoing administration and management of a government contract, including claims for breach of contract or termination, must be pursued under the CDA, not under the court's bid protest jurisdiction." *Diversified Maint. Sys., Inc. v. United States*, 103 Fed. Cl. 431, 436 (2012) (citing *Cecile Indus., Inc. v. Cheney,* 995 F.2d 1052, 1055 (Fed. Cir. 1993) ("The CDA exclusively governs Government contracts and Government contract disputes.")) (citation omitted); *Dalton v. Sherwood Van Lines,* 50 F.3d 1014, 1017 (Fed. Cir. 1995) ("When the Contract Disputes Act applies, it provides the exclusive mechanism for dispute resolution"); *see also Frazier v. United States*, 79 Fed. Cl. 148, 160 (2007) ("[P]ure contract claims are not appropriate in a bid protest, even if clothed in the guise of a protest of an alleged statutory violation occurring in relation to a procurement."), *aff'd,* 301 Fed. Appx. 974 (Fed. Cir. 2008); *Ravens Grp., Inc.*, 78 Fed. Cl. at 398 (noting that section 1491(b) provides no jurisdiction for claims of wrongful termination or breach). Furthermore, the Court of Federal Claims' CDA jurisdiction "requires both a valid claim and a contracting officer's final decision on that claim." *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citing *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541–42 (Fed. Cir. 1996)).

Melwood's Complaint, on its face, alleges cancellation of a contract before its expiration, thus it is a contract administration challenge that must be brought under the CDA, not the Court's bid protest jurisdiction. (*See* Compl. at 8, 9). Moreover, Melwood has not alleged its claim satisfies the prerequisites for a CDA claim and concedes that "the grounds for a CDA claim are not before the Court." (Pl.'s Opp. at 9 n.2, ECF No. 44). Thus, dismissal of Count I under RCFC 12(b)(1) for lack of subject matter jurisdiction is proper.

### C. Count II Must Be Dismissed Under RCFC 12(b)(1) Because it Does Not Challenge a "Final Agency Action" and is Therefore Unripe

The United States asserts that Melwood does not challenge a final agency action, but rather an inchoate decision by AbilityOne—the "intent to [re]compete the Fort Meade" BOSS Contract—therefore its entire Complaint is unripe and must be dismissed. (Def.'s Mot. at 8; *see also* Compl. at ¶¶ 1, 6, 43, 49). Melwood responds that the May 2020 email from AbilityOne stating the intent to recompete the BOSS Contract at Fort Meade evidences the consummation of the agency decision-making process. (Pl.'s Opp. at 6). Additionally, Melwood argues that even if its challenge was not ripe when the Complaint was filed, AbilityOne has now issued a formal decision which constitutes final agency action, and thus the Court should find that its challenge has ripened. (*Id.* at 8).

The Court agrees that Melwood brought this challenge too early, before a final agency action was taken, and crucially, has not attempted to cure this defect with an amended complaint.[5] However, because the Court finds Counts I and III are more appropriately dismissed on other grounds, its holding that Melwood's claim is unripe applies only to Count II.

For an action to be "ripe," the protestor must establish "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967); *see also Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1294–95 (Fed. Cir. 2008); *Tex. v. United States*, 134 Fed. Cl. 8, 17 (2017) ("It is protestor's burden to establish ripeness."). "[A]n action is fit for judicial review where further factual development would not 'significantly advance [a court's] ability to deal with the legal issues presented.'" *Caraco Pharm. Labs.*, 527 F.3d at 1295. (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003)). Hardship to the parties may be present where "the complained-of conduct has an 'immediate and substantial impact' on the plaintiff." *Id.* (quoting *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967)).

---

[5] The Court passes no judgment on whether an amended complaint would have ripened this case. Melwood has repeatedly maintained that this challenge is to the agency's *intent* recompete the Fort Meade BOSS Contract, not a challenge to the solicitation itself. During Oral Argument on Melwood's Motion to Supplement the Administrative Record, Melwood affirmed that only "Count III of our complaint actually challenges the decision itself to include . . . Fort Meade as part of the Pilot Program." (Tr. of OA on Mot. to Suppl. at 12:1–8, ECF No. 39). In fact, the Court specifically pointed out that this "seems to be . . . a challenge to the decision to *contemplate* recompeting the Fort Meade contract rather than the actual decision to recompete the contract." (*Id.* at 8:7–12).

9

However, before examining whether Melwood's claim satisfies both elements of being "ripe," the Court must first address the parties' contradicting assertions about when ripeness should be determined.

### i. Ripeness is Evaluated at the Time the Complaint is Filed

Melwood argues that even if it was not ripe when filed, its claim is "unquestionably" ripe now. (Pl.'s Opp. at 8). However, this argument misunderstands and misapplies the ripeness doctrine. The Court agrees with the United States that accepting such an argument would defeat the purpose of the doctrine, which is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1383 (Fed. Cir. 2012) (internal citations and quotations omitted).

Ripeness, for the purposes of a trial court's jurisdiction, must be evaluated when the Complaint is filed. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 734 n.2 (Fed. Cir. 1988). "The presence or absence of jurisdiction must be determined on the facts existing at the time the complaint under consideration was filed." *Id*. (citing *Jervis B. Webb Co. v. Southern Sys., Inc.*, 742 F.2d 1388, 1398 (Fed. Cir. 1984) ("[A] case or controversy must exist as of the date of the filing of the declaratory judgment action")). "[S]ubject matter jurisdictional facts must be pleaded, and proved when challenged, and . . . later events may not create jurisdiction where none existed at the time of filing." *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 635 (Fed. Cir. 1991).

However, Melwood points to two cases in which the Supreme Court suggested that ripeness may be evaluated on a "rolling basis." (Pl.'s Opp. at 8). However, these decisions apply to the prudentialism of appellate courts reviewing events that occurred after a lower court's decision.[6]

In *Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 137 (1974), the Supreme Court considered the "conveyance taking" of land for rail use under the Rail Act and the Fifth Amendment.[7] At the trial court below, the District Court determined that review of the issues would be premature since the challenged conveyance decision required several further steps

---

[6] Melwood relies on a third case, from another Judge on the Court of Federal Claims, in making its argument. That case, *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 329 n.20 (2012), stated in dicta that "jurisdictional questions of ripeness are not based on the state of affairs at the time of filing, as subsequent events may make a matter ripe." (citing *Blanchette* and *Buckley*). However, that case had no need to grapple with the prudential concerns of the ripeness doctrine as it primarily addressed mootness, but in any event, is not binding precedent on this Court.

[7] *Blanchette* is often alternatively cited as *Regional Rail Reorganization Act Cases*, 419 U.S. 102 (1974).

10

before it would constitute a "final" action. *Id*. at 138 ("The District Court's holding of prematurity was influenced by the statutory scheme that requires several decisional steps before the final conveyance."). However, soon after the District Court's decision, those "decisional steps" were completed. *Id*. at 139 ("subsequent to the District Court's opinion, the Penn Central Reorganization Court determined that the Rail Act did not provide a process that would be fair and equitable to the estate[.]"). The Supreme Court decided that, for prudential reasons, even though the issues may have been unripe for the district court, a remand would be wasteful and unnecessary since the issues had since matured. *Id*. at 140 n.25 ("It might be appropriate under different circumstances only to decide that the issues are ripe, and to remand to the District Court for their determination on the merits. However, such a remand here would be both undesirable and unnecessary.").

In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court considered the constitutionality of several provisions of the Federal Election Campaign Act of 1971, as well as not-yet-final rulings and determinations by the Federal Election Commission. After the Court of Appeals for the D.C. Circuit issued its decision, the Federal Election Commission promulgated several rules and regulations under the authority of that Act. *Id*. at 115–16. Again, for prudential reasons, the Supreme Court determined that it should consider these new regulations on appeal, despite not being presented to the courts below. *Id*. at 117. (holding that the Supreme Court was "warranted in considering all . . . aspects of the Commission's authority which have been presented by the certified questions.").

*Blanchette* and *Buckley* are an exception, not the rule, to the ripeness doctrine. Nothing in this case warrants a departure from the Federal Circuit's ripeness jurisprudence which dictates that "[t]he presence or absence of jurisdiction must be determined on the facts existing at the time the complaint under consideration was filed." *Arrowhead Indus. Water, Inc.*, 846 F.2d at 734 n.2. Thus, the Court must assess the ripeness of Melwood's claims from the time the Complaint was filed on June 23, 2020, prior to AbilityOne's formal authorization of the Pilot Program.

        ii. <u>The Inchoate Procurement Decision Melwood Challenges Does Not Satisfy the "Fitness" Prong</u>

"When a party challenges government action, the [fitness] factor becomes a question of whether the challenged conduct constitutes a final agency action." *Sys. Application & Techs., Inc.*, 691 F.3d 1374, 1384 (Fed. Cir. 2012) (citing *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1363 (Fed. Cir. 2008) and *U.S. Ass'n of Imps. of Textiles & Apparel v. U.S. Dep't of Commerce*, 413 F.3d 1344, 1349–50 (Fed. Cir. 2005)). "Final agency action hinges on two points: 'First, the action must mark the "consummation" of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."'" *Sys. Application & Techs., Inc.*, 691 F.3d at 1384 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted)).

The United States alleges that "final agency action" in this case occurred when the AbilityOne Commission took a formal written vote on July 14, 2020, authorizing the Commission to initiate the competitive process among qualified nonprofit agencies. (Def.'s Mot.

11

at 10; AR1469, 1473). Melwood alleges that final agency action was taken when AbilityOne communicated the Army's intent to select Fort Meade for the competition pilot. (Pl.'s Opp. at 6–7). Melwood frames the final agency action as the informal decision not to continue the contract with Melwood as the provider of Base Operations Support Services at Fort Meade. (*Id*.) ("No further documentation was necessary to establish the agency's final decision.").

The Court agrees with the United States that "final agency action" occurred when the formal written vote was taken and that Count II challenges agency action before a final agency decision. At any point, up until AbilityOne took a formal vote to authorize the Pilot Program, "[t]he Government could have changed its mind and decided not to proceed with the competition pilot, and the Commission could have voted to deny authorization for it to move forward." (*See* Def.'s Mot. at 10). Only when the decision was final, and the parties were assured that the Pilot Program would proceed, could "legal consequences flow." As previously stated, Melwood filed its Complaint on June 23, 2020, and a final vote did not occur until several weeks later. Melwood has not sought leave to amend its Complaint to challenge this vote, which the United States has conceded would constitute "final agency action." (*See id*.). Therefore, Melwood fails to challenge a "final agency action" necessary to satisfy the "fitness" prong of the ripeness inquiry.

> iii. Melwood Has Not Asserted it Will Suffer "Hardship" Without Review and Thus Has Conceded That Issue

To be "ripe," a plaintiff's claim must also satisfy the second prong by demonstrating a "hardship" that would be presented if the Court withheld consideration of the issues. Thus, Melwood must be able to show it has suffered an "immediate and substantial impact" stemming from the Government's conduct. *Caraco Pharm. Labs.*, 527 F.3d at 1295 (quoting *Gardner*, 387 U.S. at 171). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580–581 (1985)).

Even if it could satisfy the "fitness" prong, Melwood has not demonstrated, or even offered an argument, that it will suffer "hardship" in response to the United States' Motion to Dismiss. (*See* Pl.'s Opp. at 5–8 (discussing the point of litigation at which ripeness is determined, and the fitness of the issues, but omitting discussion of hardship to Melwood)); *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

In any event, failure to respond to the United States' ripeness arguments on the merits can be construed as a concession of the issue. *Cardiosom, LLC v. United States*, 91 Fed. Cl. 659, 664 (2010), *rev'd sub nom.*, *Cardiosom, L.L.C. v. United States*, 656 F.3d 1322 (Fed. Cir. 2011) ("[B]y failing to respond to Defendant's argument regarding the jurisdictional defect of the . . . claim, Plaintiff has effectively conceded the issue."); *Philadelphia Auth. for Indus. Dev. v. United States*, 114 Fed. Cl. 519, 527 (2014) (Sweeney, J.) (construing plaintiff's silence on the merits of defendant's arguments as waiver); *Winnemucca Indian Colony v. United States*, No. 13-874, 2014 WL 3107445, at *4 (Fed. Cl. July 8, 2014) (Firestone, J.) ("[P]laintiffs have not responded to these arguments. As such, they are deemed conceded").

Because Melwood has not identified any hardship it would suffer if the Court declines to review this unconventional, pre-solicitation challenge, the Court construes that silence as a concession that Melwood will suffer no hardship. Therefore, even if Melwood's claims in Count II were "fit" for judicial review, which they are not, Melwood cannot demonstrate a hardship necessary to establish ripeness of the issues for judicial review. Because Count II is unripe, the Court lacks jurisdiction to hear it. *See Morris v. United States*, 392 F.3d 1372 (Fed. Cir. 2004) (explaining that a Court "does not have jurisdiction over claims that are not ripe"); RCFC 12(h) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action"). Consequently, the Court dismisses Count II without prejudice under RCFC 12(b)(1) for lack of jurisdiction. *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1350 (Fed. Cir. 2015) ("If a claim is not yet ripe for judicial review, it should generally be dismissed without prejudice.").

### D. The Court Lacks Subject Matter Jurisdiction Over the Administrative Procedures Act, Thus Count III Should be Transferred to the U.S. District Court for the District of Maryland

Count III of Melwood's Complaint alleges a violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 701–706, and seeks a declaratory judgment that "the Section 898 Panel's pilot program and the selection of the Fort Meade BOS contract's participation in that program is arbitrary, capricious, an abuse of discretion, and otherwise in violation of law." (Compl. at 10–11).

The United States has moved for dismissal of this claim under RCFC 12(b)(1), asserting that the Court of Federal Claims lacks subject matter jurisdiction to hear APA claims. (Def.'s Mot. at 15 (citing *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1370 n.11 (Fed. Cir. 2005) ("Of course, no APA review is available in the Court of Federal Claims."))). This is unquestionably correct. *See, e.g.*, *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (holding that the Court of Federal Claims lacked general federal question jurisdiction to review the propriety of agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (2000)).

Melwood, in its Reply brief, recognizes this defect and now seeks transfer to the U.S. District Court for the District of Maryland. (Pl.'s Opp. at 11). Transfer may be effected under 28 U.S.C. § 1631 to cure a lack of jurisdiction if transfer "is in the interest of justice," and the destination court is one "in which the action . . . could have been brought at the time it was filed or noticed[.]" Melwood argues that transfer is "in the interest of justice" because its "claims are nonfrivolous and should be decided on the merits." (Pl.'s Opp. at 12 (citing *Galloway Farms, Inc. v. United States*, 834 F.2d 998 (Fed. Cir. 1987) ("The phrase 'if it is in the interest of justice' relates to claims which are nonfrivolous and as such should be decided on the merits."))). Melwood asserts that the District of Maryland is the proper venue under 28 U.S.C. § 1391(e) because it is where "a substantial part of the events or omissions giving rise to the claim occurred" or where "the plaintiff resides[.]" (*See* Pl.'s Opp. at 12). Of course, the BOSS Contract was performed in Maryland, where Fort Meade is located, and alternatively, Melwood's principal place of business in Maryland. (Compl. at 2, 7). Therefore, the District of Maryland would indeed be the proper venue.

13

The United States opposes transfer. (Def.'s Reply at 6, ECF No. 48). The basis of the United States' objection is that this claim is brought "in connection with a procurement or a proposed procurement[.]" (*Id*. at 6–7 (citing § 1491(b)(1))). The United States argues that "the Administrative Dispute Resolution Act of 1996 (ADRA) 'terminated federal district court jurisdiction over bid protests[.]'" (*Id*. at 7 (quoting *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001))). "Congress intended the 1491(b)(1) jurisdiction to be exclusive where 1491(b)(1) provided a remedy (in procurement cases)." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1246 (Fed. Cir. 2010).

Although Count III invokes § 1491(b)(1), the thrust of Melwood's challenge is that the implementation of the Pilot Program as a whole is a violation of the Administrative Procedures Act. (Compl. at 10). The U.S. District Court for the District of Maryland is better suited to address whether this challenge was one which Congress intended to remove from the jurisdiction of the federal district courts, and evaluate the claim's merits. On its face, Count III is a nonfrivolous claim that should be decided on the merits by a court with proper jurisdiction and venue. Accordingly, the Court transfers Count III to the U.S. District Court for the District of Maryland.

### E. Melwood's and the United States' Motions for Judgment on the Administrative Record are Denied as Moot

As explained above, this Court does not possess jurisdiction over Melwood's claims for various reasons. As such, this Court does not review the Administrative Record to determine whether AbilityOne acted arbitrarily and capriciously, abused its discretion, or violated the law with various aspects of the Pilot Program. However, like the District Court for the Eastern District of California, which reviewed the first iteration of the 898 Panel's Pilot Program, the Court has grave concerns about the legality of the Pilot Program and AbilityOne's execution of it. *See Pride Indus.*, 420 F. Supp. 3d at 1046 n.4 (noting that the Pilot Program "appears to significantly modify if not abandon statutorily prescribed pricing and allocation processes."). The Court's concerns are threefold.

First, Melwood raises a novel question of whether the program itself violates the JWOD or is authorized by the NDAA. The JWOD establishes a "uniquely tailored statutory scheme for providing government services contracts to the blind or severely disabled." *Id*. The 898 Panel and AbilityOne have, at best, ambiguous authority to implement new procurement procedures that widely diverge from those explicitly outlined in JWOD. A plain reading of the NDAA indicates that the 898 Panel is only authorized to provide *recommendations*, not implement new procedures for AbilityOne procurements. NDAA § 898(c)(2)–(7). Subsection (e) circumscribes the "authority" of the 898 Panel:

> To carry out the duties described in subsection (c), the Panel may request documentation or other information needed from the AbilityOne Commission, central nonprofit agencies, and qualified nonprofit agencies.

NDAA § 898(e). All that is granted, under a plain reading of the text, is the power to collect information in order to take the actions contemplated by subsection (c). Notably, seven of the eight delineated "duties" of the 898 Panel, as defined in subsection (c), begin with "recommend

actions," "recommend changes," "recommend ways," "recommend criteria," or "review the status" of the program. NDAA § 898(c)(1)–(7). The eighth duty would require a determination by the Secretary of Defense, not simply the initiative of AbilityOne or a "contracting activity," such as the Army. The Court believes it is possible, or even likely, that the intended end goal of the 898 Panel's authority was to report to Congress and make recommendations on how to change the governing statutes and regulations, rather than implement a Pilot Program that largely disregards the procurement procedures of the JWOD and Title 41 C.F.R. Chapter 51.

Second, the Pilot Program seems to hinge on the addition of a price component, and the two iterations so far have championed the Pilot Program's cost-savings. The Court is skeptical of whether the 898 Panel or AbilityOne may lawfully conduct a program that ignores, or runs directly counter to, the policy goals outlined by JWOD, and the procurement procedures with regard to price extensively detailed in 41 C.F.R. 51. While competition on price may not be specifically prohibited, JWOD makes clear its preference for evaluation on other components of a bid, and the detailed procurement scheme for arriving at an AbilityOne contract's price indicates bids should not contain a price component. There are specific policy reasons for these procedures clearly delineated by the statute—providing employment for the blind and severely disabled. It is unclear whether Congress intended to permit AbilityOne to drastically modify the procurement procedures which encapsulate these policy prescriptions without a clear directive that the addition of a price component is permissible.

Third, the Court is troubled by the Army's *ad hoc*, back-of-the-napkin math relied upon to determine that a resolicitation at Fort Meade could accomplish its legally dubious price-slashing goals. With its Opposition to Melwood's Motion for Temporary Restraining Order, the United States attached a Declaration that estimated "that the fair market price for this acquisition will be approximately 33% less than the current contract price. In monetary terms, the projected savings [from implementing the Pilot Program at Fort Meade] will be approximately $2.6 - 3M per year." (J. Randall Robinson Decl. at ¶ 8, ECF No. 9-1). Later, the United States submitted a Corrected Declaration, this time stating "We anticipate that the fair market price for this acquisition will be approximately 11 % less than the current contract price. In monetary terms, the projected savings will be approximately $2.2 - $2.9M per year." (Corr. J. Randall Robinson Decl. at ¶ 8). Melwood sought production of any other documents that would support a more fulsome analysis of the cost-savings by the Army, but the United States assured the Court that such analysis does not exist. (Tr. of OA on Mot. to Suppl. at 21:6–16 (stating that the cost-savings analysis "was a pretty simple arithmetic calculation.")). The Army apparently was not prompted to conduct any detailed analysis as to the differences in sizes of the facility where the contract would be performed, or the relative performance efficiency of the incumbent contractors. In response to a question from the Court, the United States provided the following summary of the Army's comparative cost-savings analysis as it was listed in the first "erroneous" declaration:

> My understanding, Your Honor, is that the Army miscalculated – did the wrong math as it were. That rather than looking at the cost savings and applying that 11 percent figure, they took the estimated size of Fort Bliss versus the estimated size of Fort Meade, the one fort being a smaller contract than the other, and we're essentially comparing apples to oranges and said,

> geez, if the contract is a third the size, or a third less in size, the price should be a third less in size as well.

(*Id*. at 22:20–25, 23:1–4). The Army apparently arrived at the 11 percent figure, the figure from the "Corrected Declaration," much the same way, without regard to disparities in efficiency of the incumbent contractor's performance:

> In performing the estimate with the 11 percent cost savings, the Army looked at what the price under the old contract at Fort Bliss was and the annual price under the new contract at Fort Bliss and did simple arithmetic to realize an 11 percent cost savings. And that, in Mr. Robinson's declaration, the 11 percent cost construction was applied to the new estimated value of the new contract. Again, simple arithmetic yielded the cost range that was arrived at.

(*Id*. at 21:6–16). However, the Army's own independent estimate contradicts whether it would actually save costs from recompeting the BOSS Contract at Fort Meade. The Army's Independent Estimate for pricing of the Fort Meade contract showed a base year total cost of $26,062,290.04 and a five-year total cost of $136,521,931.90. (AR334, 339). Melwood asserts that it had performed the BOSS Contract at approximately $20.8 million in the previous contract year (2019–2020). (Pl.'s MJAR at 5–6). By the Army's own independent estimate, recompetition of the BOSS Contract could actually lead to a contract price *increase* of $5.2 million in the base year. This discrepancy highlights, and calls into question, the efficacy of the Army's primary stated goal for the Pilot Program: cost savings.

The United States argues that "no 'statutory or regulatory provision . . . precludes'" the Pilot Program's inclusion of a price component. (Def.'s Reply at 12; *see also* Def.'s Mot. at 22–23). In the alternative, the United States would place its reliance on a favorable standard of review, arguing that even if the competition Pilot Program is contrary to the JWOD, it does not present either a "clear" or "prejudicial" violation of the law and thus must be upheld. (*See* Def.'s Mot. at 24). Perhaps the United States is correct, but this is no way to run a railroad. The Court tends to agree with its peer, the District Court for Eastern District of California, in observing that the United States' arguments "appear to oversimplify and ignore the statutory scheme Congress designed to distance price from the decision process to encourage government hiring of blind and severely disabled people." *Pride Indus.*, 420 F. Supp. 3d at 1046 n.4 (citing 41 U.S.C. § 3304(a)(5) and F.A.R. 6.302-5(b)(2)).

Twice now courts have dismissed challenges to this Pilot Program as unripe. The APA challenge from Pride Industries was unripe when brought prior to final contact award. *Pride Indus.*, 420 F. Supp. 3d at 1045. This Court has now found that Melwood's challenge under 28 U.S.C. § 1491(b)(1) is unripe because it was brought prior to a formal vote to issue the solicitation, and thus there is no final agency action to review. Despite the Court's concerns, it must reserve judgment for a claim that properly presents the issues for the Court's review. In light of its holding that the Court lacks jurisdiction, both Melwood's and the United States' Motions for Judgment on the Administrative Record are denied as moot.

### III. Conclusion

The Court does not possess subject matter jurisdiction over Melwood's Complaint. Because it does not possess subject matter jurisdiction, it cannot issue a decision on the merits of the parties' motions for judgment on the administrative record. Accordingly, the Court orders the following:

1. The United States' Motion to Dismiss, (ECF No. 42) is **GRANTED**.

2. Melwood's Motion for Judgment on the Administrative Record, (ECF No. 34), is **DENIED AS MOOT**.

3. The United States' Motion for Judgment on the Administrative Record, (ECF No. 42), is **DENIED AS MOOT**.

4. Count I of Melwood's Complaint shall be **DISMISSED** without prejudice.

5. Count II of Melwood's Complaint shall be **DISMISSED** without prejudice.

6. Count III of Melwood's Complaint shall be **TRANSFERRED** to the United States District Court for the District of Maryland.

7. No costs or fees shall be awarded.

8. The parties are **DIRECTED** to submit their proposed redactions no later than December 7, 2020.

**IT IS SO ORDERED.**



s/     David A. Tapp
DAVID A. TAPP, Judge